IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AQUILA PIPELINE SERVICES, LLC | § | |
| | § | |
| *Plaintiff*, | § | |
| v. | § | Civil Action No_____. |
| | § | |
| FLOWCHEM, LLC, LU-CHIEN CHOU AND | § | |
| HARRELL HOOKER | § | |
| | § | |
| *Defendant.* | § | DEMAND FOR JURY TRIAL |

COMPLAINT

Plaintiff, Aquila Pipeline Services, LLC ("Aquila") brings this Complaint against Defendants, Flowchem LLC ("Flowchem"), Lu-Chien Chou ("Chou") and Harrell Hooker ("Hooker") and alleges as follows:

NATURE OF THE ACTION

1.      This is an action for patent infringement pursuant to 35 U.S.C. § 271, and for declaratory judgment of patent infringement under 28 U.S.C. § 2201, for a reward in damages for patent infringement pursuant to 35 U.S.C. § 284. The '527 Patent pioneered by Aquila provides a competitive edge to Aquila. This is also an action for theft and/or misappropriation of trade secrets and for resulting damages pursuant to 18 U.S.C. § 1836. The '527 Patent improves the homogenization of reaction monomers, catalysts, co-catalysts,  hydrocarbon dispersants of catalysts/co-catalysts, processes involved in raw material introduction and reaction mixture

curing thereof, impacting the polymerization rates to attain molecular structure and ultimate molecular weight during the manufacturing of the poly alpha-olefin drag reducing agent ("DRA")[1] that improves polymerization and monomer conversion. The optimization reaction mixture conversion improves product efficiency reducing the cost of manufacturing and product effectiveness to the customers. Aquila's '527 Patent discloses and claims a novel and innovative method for the manufacturing of the poly alpha-olefin DRA.  Aquila's patented method is used by Aquila in the manufacturing process in the DRA Aquila markets and sells. Without the patented process developed by Aquila, the polymer molecular architecture will not equal or exceed that of Aquila's. No other DRA manufacturing processes works as effectively as achieving the molecular architecture as that of Aquila.

2.    Flowchem has and is making DRA that infringes on the '527 Patent.  Flowchem is in the process of making substantial and meaningful preparations to use, contribute to others' use of, and/or induce others to use methods that have infringed and/or will infringe Aquila's '527 Patent.  Flowchem is advertising DRAs that are material to practicing and are especially made and adapted for use in a manner that infringes, the claims of Aquila's '527 Patent.  Aquila is suffering enormous and irreparable harm and prejudice and will continue to do so if Flowchem's infringement is not stopped.  Aquila thus brings this action to obtain declaratory relief to protect itself from imminent future acts of direct and/or indirect infringement by Flowchem and the irreparable harm that Aquila will continue to suffer, to its substantial detriment and prejudice, in

---

[1] A drag reducing agent is any material that increases the flow rate in pipeline by decreasing frictional resistance within the fluid flow. In essence, DRA polymer molecules stretch out to long lengths acting as shock absorbers reducing the loss of energy due to turbulence in the pipe and, thereby, significantly increasing the flow rate and lowering the cost of pumping the fluids.

the absence of such relief.

3. Furthermore, Defendants Hooker and Chou have misappropriated trade secrets including the data generated from the use of the '527 Patent in the manufacturing of DRA, the theft of a custom designed and manufactured Quality Assurance / Quality Control ("flow loop") instrument to test the performance of the DRA polymer, as well as various formulations, including but not limited to water slurry formulation, cold weather formulation, medium crude formulation and heavy crude formulation all developed by Chou while working in Aquila's facility.

4. Chou worked in concert with Hooker to prevent Aquila from having access to Aquila's Proprietary Information as is defined under the Invention, Confidential Information and Non-Solicitation Agreement ("IPA"). Ex. B.

5. Hooker failed to require Chou to record the information related to Chou's work on a company cloud drive, server or hard drive that remained locked in the facility or even provide copies of the information Chou recorded and stored in the laptop Chou used while working at Aquila's facility. Hooker did not require Chou to secure his notes in the facility.

6. Hooker failed to require Chou to submit for reimbursement for the use of items Chou purchased and used while working at Aquila's facility including the laptop computer. Hooker permitted Chou to leave the facility with the laptop computer Chou used during his employment wherein Chou kept Aquila's Proprietary Information. Hooker allowed Chou to take other forms of notebooks and repositories of information out of Aquila's facility. Hooker failed to protect Aquila's data developed while Chou was employed nor obtain nondisclosure agreements.

7.      Chou refused to submit for reimbursement for the laptop or use a company laptop during his employment with Aquila even though Chou submitted for reimbursement for other items. Chou refused to leave his laptop locked in the office, but rather, Chou took the laptop out of the facility when he left the facility and only brought it back while Chou was working at the facility. Chou refused to store the Aquila data he generated on his laptop computer during his work at Aquila onto an Aquila cloud drive, an external hard drive or even provide Aquila a copy of the data when requested. Chou kept his login and password for the laptop secret, and Hooker did not require Chou to provide Aquila such information during Chou's employment.

8.      Chou refused to provide the contents and proportions of chemicals in the use of DiBAC co-catalyst to manufacture Aquila's DRA. Chou refused to provide any information about what Proprietary Information, as that term is defined under the IPA in Ex. A attached hereto, Chou developed or was developing while employed with Aquila. Hooker did not require him to do so.

9.      Chou brought certain inventory into the laboratory not necessary for the work Aquila engaged Chou to perform. For instance, Chou had glass apparatus and caused Aquila to purchase chemicals during the first six months of his employment for the development of a specifically unique heavy crude oil DRA. Neither Chou nor Hooker informed Aquila ownership of the reasons for these purchases or provided the data generated during the consumption of the chemicals in the laboratory.

10.     Chou refused all requests to provide Aquila access to the data generated while Chou developed the poly alpha-olefin DRA using the '527 Patent. Hooker did not require him to

do so and actively worked to prevent Aquila ownership from obtaining a copy of the information.

11.     Without the use of the '527 Patent, the data Chou took from Aquila and has refused to return would not be usable. The patented process improves the homogenization of the chemicals to increase the conversion which affects the data generated during the manufacturing process.

12.     Chou and Hooker know of the '527 Patent as former employees of Aquila; that its method of making poly alpha-olefins and compositions through agitation in a first reaction vessel for about 30 seconds or greater of certain chemicals before transferring the composition into a second reaction vessel improves product uniformity and conversion in the manufacturing of poly alpha-olefin DRA and thereby improves product performance and profits related thereto; that Chou as Aquila's Technology Manager developed data during his employment with Aquila for manufacturing DRA using the '527 Patent; that Flowchem, Aquila's direct competitor, employed Hooker and Chou to improve its technology; that Aquila sent Flowchem a cease and desist letter attached hereto in Exhibit C; that Flowchem acknowledged receipt of the cease and desist and of the IPA; that use of Chou's data would require use of agitation in the process of manufacturing DRA; that the use of agitation in the process of manufacturing DRA would violate Aquila's '527 Patent; that Defendant Chris Oversby ("Oversby") knew of the '527 Patent during Infinium's due diligence related to the failed attempt to purchase Aquila in 2021 while Hooker was still employed by Aquila; and that Chou took the data when he terminated his employment with Aquila and joined Flowchem in the same capacity as his employment with Aquila.

13.     Subsequently in 2022-2023, Oversby led another failed attempt representing

Infinium to purchase Flowchem and finally concluded a later purchase of Flowchem by SCF partners in March 2024 and was thereafter granted a Director's Board seat of Flowchem. Thus, the Defendants' actions are therefore deliberate and willful.

<u>THE PARTIES</u>

14. Aquila Pipeline Services, LLC is a Texas limited liability company organized and existing under the laws of the State of Texas, and maintains its headquarters and principal place of business at 12060 FM 3083 in Conroe, Texas 77373.

15. Aquila is and has long been a pioneer in the field of drag reducing agents which improve flow in pipelines. Aquila's patented process improves conversion in the manufacturing of poly alfa-olefins which improves product quality and reduces the cost of goods sold.

16. Defendant, Flowchem is a foreign limited liability company organized under the laws of the State of Delaware with its principal place of business located at 43253 Old Houston Highway, Waller, Texas 77484 and may be served through its registered agent Corporation Service Company d/b/a – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

17. Defendant, Lu-chien Chou, is an individual domiciled at 27810 Colonial Point Dr., Fort Bend County, Katy, TX 77494.

18. Defendant, Harrell Hooker, is an individual domiciled at 1608 Michael St, El Campo, Wharton County, Texas 77437-9348.

19. Defendant, Sean Rice, is domiciled in Harris County, Texas and may be served at his business address at 600 Travis St., #6600 Houston, TX 77002.

20.     Defendant, Chris Oversby, is domiciled in Harris County, Texas and may be served at his business address at 20333 Blinka Rd. Waller, TX 77484.

<u>JURISDICTION AND VENUE</u>

21.     This is an action for patent infringement pursuant to 35 U.S.C. § 271, for declaratory judgment of patent infringement pursuant to 28 U.S.C. § 2201, for a reward in damages for patent infringement pursuant to 35 U.S.C. § 284. This is also an action for theft and/or misappropriation of trade secrets and for resulting damages pursuant to 18 U.S.C. § 1836.

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(b).

23.     This Court has personal jurisdiction over the Defendants because they are domiciled in this District and because Flowchem conducts business in this District, regularly solicits business from this District, does business with, and derives value from services provided to, customers in this District, and intends imminently to commit acts of patent infringement in this District and thus cause injuries to Aquila in this District.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(b) because one or more of the Defendants reside in this District, Flowchem operates in this District, Flowchem has its principal place of business in this District, a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

THE '527 PATENT

25.    On December 5, 2023, the United States Patent and Trademark Office duly and legally issued United States Patent No. 11,834,527 (the "'527 Patent"), entitled "Poly Alpha-Olefins, Compositions Thereof, and Methods of Making" after a full and fair examination. A true and correct copy of the '527 Patent is attached as Exhibit B.

26.    Aquila is the owner by assignment of the '527 Patent and holds all rights, title, and interest in and to the '527 Patent, including the right to sue and recover for all past, present, and future infringements.

FACTS

A.  Aquila and Flowchem are direct competitors

20.     In 2019, several longtime members in the DRA industry formed Aquila to improve delivery of DRA polymers through trade secrets developed in-house and a patent previously owned by Western Performance Chemicals, LLC ("Western") through an Intellectual Property Assignment Agreement ("IPAA") from Western to Aquila.

21.    Only a handful of companies globally manufacture DRA polymers similar to those manufactured and delivered by Aquila, and none of the other companies has a poly alfa-olefin DRA product quality or delivery efficiency superior to Aquila. In fact, Flowchem describes itself as "a leading global player in the DRA market, providing custom-engineered specialty chemicals to help customers around the world optimize the performance of their infrastructure."

22.    As such, Flowchem is Aquila's direct competitor in the DRA market.

B. Aquila's employment agreement with Chou and disclosure of Aquila's intellectual property, trade secret and confidential information.

23.    On July 18, 2022, Chou entered into the IPA. Ex. B. Aquila employed Chou as Technology Manager for development of the processes used in formulating, producing and delivering DRA sold by Aquila.

C. Nondisclosure of Proprietary Information

24.    Among other matters, Chou acknowledged Aquila engages in development of processes, manufacture of products or performance services, which involve experimental and inventive work, of which the success depends on protection of this Proprietary Information. Ex. B.

25.    The IPA defines "Proprietary Information" as all methods, inventions, improvements or discoveries, whether or not patentable or copyrightable, and any other information of a similar nature disclosed to Chou or developed by Aquila during Chou's employment including trade secrets, process, products, formulae, apparatus, techniques, know-how, marketing plans, data, improvements, strategies, forecasts, customer lists, and technical requirements of customers to which Chou would and did have access during his employment and promised not to disclose or otherwise claim rights to the proprietary information. Ex. B.

26.    Chou also acknowledged and agreed that Aquila owned all Proprietary Information, and Chou assigned all rights to Proprietary Information Chou might otherwise possess to Aquila and shall not communicate, disclose or disseminate any Proprietary Information or any other information of a secret, proprietary, confidential or generally undisclosed nature relating to Aquila, its products, customers, processes and services, including

information relating to testing, research, development, manufacturing, marketing and selling. Ex. B.

27.    Chou agreed to turn over all such Proprietary Information upon resignation or at any other time requested by Aquila, including all documents, records, notebooks, notes, memoranda and similar repositories of or containing Proprietary Information and all other proprietary, confidential or generally undisclosed nature relating to Aquila. Ex. B.

28.    In its acceptance of Chou's resignation letter, Aquila requested return of its Proprietary Information and other property belonging to Aquila that Chou took with him upon notification of Chou's resignation including, laptops, computers, tablets, cell phones, PDA's, electronic equipment, all lab equipment, polymer performance loop, and technical data. Ex. C.

29.    Chou used a laptop computer wherein he recorded his day-to-day work performed during his employment with Aquila. After repeated requests, Chou refused to return the laptop, which is and contains company data and intellectual property.

30.    As the information contained in Chou's notes on the computer pertain to the manufacture of the polymer using the '527 Patent, there is a high probability that Chou is using the information as part of Flowchem's technology team and is withholding information covered by the Spoliation letter as discussed below.

31.    In fact, Flowchem announced the hiring of Chou as "significantly enhancing its product development capabilities," as Chou "is a recognized leader in the field who has led cutting-edge DRA research at Baker Hughes *and other DRA providers.*" *Flowchem Strengthens Leadership Team, Appoint COO, Technology Team, and Board of Senior Industry Experts,*

Businesswire, February 13, 2025 ("Press Release") (emphasis added).

32.    Chou often took notes in Mandarin, instead of the mandated English, and he refused to translate these notes into English. Chou left a blue binder, but he failed to leave detailed instructions on how to decipher his shorthand notes therein.  There is a second blue binder with Aquila trade secret operating data that Chou stole and has refused to return.

33.    Chou agreed not to assert any rights under any inventions, copyrights, discoveries, concepts, or ideas, or improvements thereof, or know-how related thereto, as having been made or acquired by him prior to being engaged by Aquila or during the term of his engagement. Ex. B.

34.    Chou has failed to return Property to Aquila.

D.    Assignment of Inventions

35.    In section 2 of the IPA, Chou agreed that all Inventions (defined as discoveries, concepts and ideas, whether patentable or copyrightable or not, including but not limited to improvements, know-how, data, processes, methods, formulae and techniques, as well as improvements thereof or know-how related thereto, concerning any past, present or prospective activities of the Company) shall be the sole property of Aquila. Ex. B.

36.    In addition, Chou agreed that all Inventions based on Proprietary Information which Chou makes, discovers or conceives shall be the sole property of Aquila. Ex. B.

37.    Chou agreed to keep written notebooks of all Inventions describing in detail the procedures employed and the results achieved as well as information as to any studies or research projects undertaken on Aquila's behalf. Ex. B. Furthermore, the notebooks shall be the property of Aquila as well. Ex. B.

38.    During his employment, Chou removed a flow loop that is a proprietary device used to test the performance of the polymer. The flow loop would have no benefit to Chou unless he is using it to test the performance of polymer his current employer, Flowchem, is manufacturing. While Chou developed, constructed, calibrated and operated the flow loop at Aquila's plant for use in testing Aquila's products, Chou took and refused to return the flow loop or provide detailed instructions on how to manufacture, construct, calibrate and operate the flow loop as required under the IPA. Chou developed his own codes for recording data sets from the flow loop, and again, he refused to provide the codes either before or after his resignation.

39.    During his employment, Chou was charged with creating and operating a laboratory for development of Proprietary Information used to produce the DRA polymers. Chou refused to provide information related thereto either before or after employment. In addition, Chou removed various other formulation samples of products in development, including but not limited to: 1) freeze protected product; 2) water formulation product; and 3) high temperature stability product. Chou also purchased the materials to develop a heavy crude oil DRA as well.

40.    Furthermore, Chou claimed ownership of items located in the lab and has refused to return them to Aquila. Instead, Aquila paid Chou for the items Chou claimed he owned. However, everything related to Chou's work belongs to Aquila, as expressly set forth in the IPA. Ex. B.

41.    After repeated demands both before and after his resignation, Chou failed and refused to provide any information related to his work at Aquila. Aquila asked for all of the property to be returned, and Chou has and continues to refuse.

E.  Flowchem attempts to acquire Aquila's assets

42.     Floundering in the marketplace because of problems with its product and customer complaints, Flowchem sought to acquire Aquila's assets which, in no small part, included Aquila's '527 Patent and trade secret formulation that has rendered an industry leading turnaround time on DRA production.

43.     In October 2022, Oversby was an advisor of Infineum USA L.P. ("Infineum"), during its attempt to acquire Flowchem, owned by Entegris, Inc. ("Entegris").

44.     On or about October 11, 2022, Infineum announced that it had entered into a definitive agreement with Entegris to buy Entegris' Pipeline and Industrial Materials ("PIM") business, part of which was Flowchem: Infineum to Acquire Entegris' Pipeline and Industrial Materials Business as Part of its Transformational Growth Strategy | Entegris.

45.     On or about February 9, 2023, however, Infineum announced the cancellation of the deal to acquire Entegris' PIM business: Infineum USA L.P. cancelled the acquisition of Pipeline and industrial materials business from Entegris, Inc.. | MarketScreener.

46.     On February 26, 2023, Aquila's email records show that Oversby in (chris@jcosconsulting.com) in his advisory role at Infineum begins formal communication with Aquila via Steve Erikson ("Erikson") to acquire Aquila.  Hooker, Aquila's General Manager, was also involved in the potential Infinium acquisition and was made aware of the discussions between Oversby and Erikson. Oversby established direct communication with Hooker approximately thereafter.

47.     On April 4-5, 2023, Aquila's email records show Oversby followed up with Erikson

to meet for lunch to further discuss Infineum's potential acquisition of Aquila.

48.     Following Oversby's and Erikson's lunch, and on or about May 29, 2023, Aquila's email records demonstrate that Oversby again contacted Erikson about Infineum's interest in the potential acquisition of Aquila. Oversby advised Erikson that Oversby intended to introduce the subject of Infineum's acquisition of Aquila to Infineum's Board of Directors at its next board meeting on June 19, 2023.

49.     On May 31, 2023, Erikson, however, advised Oversby that Aquila was not interested in pursuing Infineum's acquisition.

50.     On August 16, 2023, Oversby communicated to Erikson that changes in the C-suite at Infineum had resulted in Oversby's no longer continuing to act in an advisory capacity with Infineum.

51.     Concomitantly, and beginning in Spring of 2023, Entegris hired Jefferies Financial Group, Inc. ("Jefferies") to evaluate a go to market strategy to sell Entegris' PIM business, of which Flowchem was a part.

52.     In the third and fourth quarters of 2023, Jefferies marketed the PIM group to potential acquirers. By year's end 2023, Jefferies had compiled a short list of potential suitors of Integris' PIM business.

53.     On March 4, 2024, SCF Partners ("SCF Partners") announced that it had submitted the successful bid to acquire Entegris' PIM business, including Flowchem. SCF Partners | SCF Partners Acquires Flowchem, Sealweld, and Val-Tex.

54.     Sean Rice ("Rice") is an Operating Partner of SCF Partners overseeing SCF's

Partners' PIM business: https://www.scfpartners.com/team/sean-d-rice/

55.     In the second and third quarters of 2024, SCF/Rice began to understand the product problems (low performing polymer and lack of product stability) that Flowchem was experiencing.  Simultaneously, Hooker advised multiple times that Rice not only reached out to Hooker but also that Hooker had direct contact with Rice.

56.     In approximately the second or third quarter of 2024, Oversby negotiated with SFC Partners to appoint Oversby to Flowchem's Board of Directors stating that he was "bringing a team to clean up the product problems at Flowchem."

57.     In October of 2024, Hooker represented in a sales call meeting with Versalis[2] that Oversby was on Flowchem's Board of Directors with plans to recruit former Flowchem managers to return to Flowchem and assist in its turnaround.

58.     On November 1, 2024, Hooker threatened the CEO of Aquila, Manuel Silva III ("Silva") that "if things didn't improve at Aquila by January 2025 with his compensation plan, then he was leaving."

59.     Hooker further admitted to Silva that he and Chou had many ideas while working at Aquila that they were not "putting on the table" because of dissatisfaction with the ownership promises Erikson allegedly had made to them. Silva advised Hooker that Hooker had conflicted interests and was not upholding his fiduciary responsibility, subsequently removing Hooker as a Manager of Aquila.

---

[2] Versalis Oilfield Solutions S.r.l. is an Italian company that develops and deploys specialty chemicals in the oil and gas industry worldwide.

60.     On or about November 14th and 18th of 2024, Hooker instructed Tammy Cooper ("Cooper"), Aquila's Office Manager, to call Rice at 713-227-7888 on Hooker's behalf. https://www.scfpartners.com/contact/

61.     Hooker advised Cooper that Rice was a prospective customer and also requested that Cooper call Rice on a separate non-Aquila phone number.  It is estimated that Hooker used Aquila funds to purchase over 10 "burner phones" from Walmart in the two years prior to his resignation, and one of the "burner phone" numbers associated Rice's telephone number.

62.     During Chou's employment, Aquila shared Proprietary Information with Chou concerning Aquila's DIBAC[3] trade secret technique, the laboratory and paid Chou to use Aquila's '527 Patent and trade secrets that played an instrumental role in developing Aquila's DIBAC trade secret technique that:

     a.  Enables the polymer reaction to be performed at ambient temperature (70F) versus having to start the polymer process at 40F for at least 2-3 days;

     b.  Enables a more stable reaction, producing a higher performing polymer; and

     c.  Decreases the cure time from 30+ days to approximately 7 days for the majority of the reaction and to complete over 90% conversion within 14 days.

F.  Chou's resignation

63.     Chou also agreed not to, during his employment, and for one year thereafter, induce any employee or consultants to leave Employers, interfere with the relationship of the Employers and its employees/consultants, or employ (directly or indirectly) any employee/consultant who has worked for Employers within six months of resignation. Ex. B.

---

[3] DiBAC is an aluminum alkyl used as a co-catalyst in the polymerization of olefins.

64.   Hooker made the same agreement with Aquila.

65.   On January 24, 2025, Chou and Hooker resigned together.

66.   Aquila ownership obtained access to the lab only to find various items missing that may include, but are not limited to:

a.   Documents taken out of the Aquila facility.

b.   Drawings of the processing plant;

d.   Electronic files produced while employed by Aquila;

e.   All Aquila lab equipment dismantled & taken out of the Aquila lab before issuance of the resignation letter;

f.   The operating procedures of lab experiments & quality control systems implemented while employed by Aquila;

g.   Receipts of all chemicals & equipment purchased via personal accounts & paid for by Aquila during time of Aquila employment;

h.   All Tech Data sheets & SDS of all lab chemicals/products purchased while employed by Aquila;

i.   All lab notebooks, diaries, or other written material, electronic or otherwise, of lab work performed while being employed by Aquila in English along with information necessary to decipher Chou's shorthand for the notes;

j.   The custom assembled performance flow loop along with reconstruction, calibration and instructions for use with all historical data generated therefrom;

k.   All the performance data of both the polymer and end product in the time of Aquila employment;

l.   The studies and development of each polymer formulation devised while employed at Aquila, specifically all evaluation data of the catalyst system using DIBAC with all the ingredients and formulation procedures;

m.   The studies and development of each product formulation devised while

employed at Aquila, including but not limited to:

1. Water system formulation, all components of the formulation and formulation procedure; and

2. Freeze protected formulation, all components of the formulation and formulation procedure.

n. All digital pipeline performances assembled while employed at Aquila including but not limited to:

   i. Abu Dhabi - ADNOC (UAI-WSP) Field Trial Evaluation

   ii. EACOP - Uganda Pipeline evaluation

o. All formulations implemented for any commercial product as well as all/any products in development;

p. All Aquila electronic emails that Chou has in his possession at Aquila email: luchien@aquilapipeservices.com;

q. All electronic emails in reference to any Aquila emails that Chou has in his possession at any personal email including but not limited to:

   i. fling653813@gmail.com;

   ii. mdr4771@gmail.com; and

   iii. lchou@address.com.

r. All electronic files that Chou has in his position related to any Aquila business.

G. Chou ignores Aquila's demand to return Aquila's property

67.    On January 27, 2025, Aquila notified Chou of its waiver of Chou's two-week notice and accepted his resignation effective as of close of business on January 24, 2025. Ex. E. Aquila demanded that Chou return to Aquila all property of Aquila in his possession, custody or control. Ex. E. Specifically, Aquila requested that Chou immediately return the following:

all property of the Company previously provided to you and/or otherwise in your possession or control, including, without limitation, all laptops, computers, tablets, cell phones, PDAs, electronic equipment, battery backups, credit cards, Company vehicles, Company vehicle keys, trailer keys, building keys, filing cabinet keys, access cards, a list of all Company accounts to which you have access and the associated user names and passwords, a list of any other Company accounts created by you, all Company tools, Company drawing associated with the production process, delivery trailer, product injection skids and any other company property.

Ex. E.

68.     To date, Chou has not returned all of the property to Aquila subsequent to the list of items in the note dated March 27, 2025. By way of example and not by way of limitation, Chou did not return the correct flow loop tube, electronic automation or data logging devices, failed to calibrate the flow loop (because he could not with the incorrect flow loop tube he brought when he returned some of the flow loop), and provided no Standard Operating Procedures ("SOP").

69.     Chou agreed to notify his new employer, and if he failed to do so, Aquila could have done so. Chou has not notified Aquila of compliance therewith. In fact, on January 27, 2025, Flowchem indicates that Chou provided a fraudulent document.

70.     The Contract permits Aquila to enforce its provisions through, among other means, injunctive relief.

H.  Flowchem employs Chou

71.     Chou resigned from Aquila on January 24, 2025. Ex. C.

72.     Flowchem announced it had employed Chou in the Press Release.

73.     Although Chou joined Aquila without listing any prior knowledge of the proprietary, trade secret and confidential information related to DRA development, the Press Release indicates that Chou joined Flowchem to enhance Flowchem's product development

capabilities as a leader in cutting-edge DRA research for other DRA providers.

74.     On February 14, 2025, Aquila wrote Flowchem's CEO, Jon Blair, and requested that Flowchem cease and desist from violations of an Invention, Confidential Information and Non-Solicitation Agreement of Lu-chien Chou. Ex. B. Flowchem had actual knowledge of the '527 Patent prior to the filing of this Complaint and by no later than February 14, 2025. Ex.'s C-D.

75.     Thereafter, Silva recently learned that a customer of Flowchem indicated that Flowchem's poly alpha-olefin DRA quality had increased shortly after Chou joined Flowchem. In addition, Flowchem had a new water slurry for injecting the DRA. Prior to Chou joining Flowchem, Flowchem did not have a water slurry for injecting the DRA into pipeline. A few weeks later, Aquila learned during a product test in Nebraska that Flowchem had demonstrated a new heavy crude DRA which is also a product Flowchem did not provide before Chou joined Flowchem. However, Chou developed these products while employed by Aquila.

COUNT 1 – DECLARATORY JUDGMENT OF INFRINGEMENT OF U.S. PATENT NO. 11,834,527

76.      Aquila incorporates by reference all factual allegations articulated hereinabove as if fully set forth at length.

77.     There is an actual, substantial, and justiciable controversy between Aquila and Flowchem concerning Flowchem's direct and indirect infringement of one or more claims of the '527 Patent.

78.     There is an actual, substantial, and justiciable controversy between Aquila and Chou concerning Chou's direct and indirect infringement of one or more claims of the '527 Patent.

79.    There is an actual, substantial, and justiciable controversy between Aquila and Hooker concerning Hooker's direct and indirect infringement of one or more claims of the '527 Patent.

80.    Flowchem, Chou, and Hooker are jointly and severally liable for the infringement (and continued infringement) of the Patent. Specifically, Flowchem courted Chou (while he was still in Aquila's employ) to steal the Flowloop, notes/notebooks, the laptop, laboratory equipment *inter alia* and later implement (at Flowchem) the homogenization process which is subject to the '527 Patent. The data which Chou stole was all generated using the homogenization process. Said another way, without implementing the homogenization process at Flowchem in violation of the '527 Patent, all of the stolen notes, data, laptop, *et al* would serve no purpose as Chou would not be able to replicate for Flowchem, the tests and results from his days with Aquila.

81.    Upon learning of an opportunity for financial gain by taking Aquila's technology, equipment, inventions, and proprietary information and moving them over to Flowchem's operation, Hooker, in concert with Chou, schemed to prevent Aquila from obtaining its proprietary information. Specifically, Hooker failed to require Chou to record the information related to Chou's work on a company server or hard drive that remained locked in the facility or even provide copies of the information Chou recorded and stored in the laptop Chou used while working at Aquila's facility. Hooker did not require Chou to leave all of Chou's hardcopy notes in a locked filing cabinet in the facility and even allowed Chou to take the laptop and other notebooks outside of Aquila's facility. Hooker and Chou jointly executed this malevolent scheme so that before jointly and simultaneously defecting to Flowchem, they could demonstrate that

possession of a novel technological concept that would give Flowchem an insurmountable advantage over its competitors (Aquila being amongst them).

82.   Furthermore, since Flowchem hired Chou, industry insiders have reported that Flowchem has seen significant improvement in the quality of its polyalphaolefin-based DRA. Technology experts who are employees and/or associates of Aquila have also reported to Aquila executives that there is *no possible way* that Flowchem could have improved the quality of its polyalphaolefin-based DRA in such an implausibly short amount of time without using effectively the *exact same* homogenization process that is subject to the '527 Patent.

83.   As follows, Aquila is entitled to, and hereby requests, a judicial declaration that Flowchem has infringed, will infringe, has induced the infringement of, and/or has contributed to the infringement of one or more claims of the '527 Patent, literally or by equivalence, by making, using, selling, importing, and/or offering to sell any variety of polyalphaolefin-based DRA as a result of using the homogenization process subject to the '527 Patent, and/or providing others with the polyalphaolefin-based DRA and/or instructing others on how to use the homogenization process subject to the '527 Patent and/or instructing others how to use the homogenization process subject to the '527 Patent.

84.   Furthermore, Aquila respectfully requests a judicial declaration that Chou has contributed to the infringement of one or more claims of the '527 Patent, literally or by equivalence, by enabling Flowchem to take advantage of the illicitly replicated homogenization process subject to the '527 Patent by stealing the Flowloop, notes/notebooks, the laptop, laboratory equipment *inter alia* to be used in concert with the homogenization process subject

to the '527 Patent for purposes of developing and manufacturing polyalphaolefin-based DRA and/or directly implementing and using the homogenization process subject to the '527 Patent to develop and manufacture polyalphaolefin-based DRA under Flowchem's employment.

85.    Additionally, Aquila respectfully requests a judicial declaration that Hooker has contributed to the infringement of one or more claims of the '527 Patent, literally or by equivalence, by inducing Chou to hide proprietary information Chou developed while Aquila employee, using Aquila's laboratory and equipment and to steal notebooks and the laptop which contain data sets and other proprietary information to aid Flowchem in taking advantage of its illicitly- replicated homogenization process to develop manufacture polyalphaolefin-based DRA.

86.    Flowchem, Chou, and Hooker's activities have caused and will continue to cause irreparable harm to Aquila in its business and property rights. As follows, Aquila respectfully prays that the Court award unto Aquila, the maximum amount in compensation as is permitted under 35 U.S.C. § 284.

## COUNT 2 – – DEFEND TRADE SECRET ACT

87.    Aquila reincorporates and realleges all of the above paragraphs as if included herein.

88.    Pursuant to 18 U.S. Code § 1836(1) and § 1839(4), Aquila has standing to sue under the Defend Trade Secrets Act ("DTSA") because Aquila is the owner of 15 trade secrets and has rightful legal or equitable title to, or license in, to them in connection with the DiBAC, water slurry,

freeze-protected, and crude oil formulations that Chou, Hooker, Rice, and Oversby misappropriated.

89.     Chou executed the IPA, in which Chou agreed that Aquila has "exclusive property rights" to all of Aquila's "Proprietary Information," which includes trade secrets. Ex. B. Moreover, Chou agreed in the IPA that all "Inventions," or "discoveries, concepts, and ideas" that he made while employed by Aquila are Aquila's "sole property." Ex. B. Finally, because Chou did not except "any inventions or improvements relevant to the subject matter of his engagement" by Aquila in the IPA's Exhibit A, all the inventions and improvements on which he worked while employed by Aquila are Aquila's "sole property." Ex. B.

90.     Trade secrets also exist. Pursuant to 18 U.S. Code § 1836 (b) (1) and 18 U.S. Code § 1839(3), the information composing them are financial, business, scientific, technical, and engineering information that includes formulas, designs, prototypes, methods, techniques, processes, and procedures.

91.     Under 18 U.S. Code § 1839(3) (A), Aquila took reasonable measures to keep such information secret by enclosing with a fence the perimeter of Aquila's facility, monitoring the facility with a video system and staff members at the entrance, locking the doors of the facility, restricting access to the lab with a doorbell and locked door, requesting entrants to Aquila's facility to sign non-disclosure agreements, and having Chou execute the IPA.

92.     Pursuant to 18 U.S. Code § 1839(3) (B), the information composing the trade secrets "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can

obtain economic value from the disclosure or use of the information" because the information concerns the products and therefore competitive advantage Aquila would have in the DRA marketplace.

93.     Pursuant to 18 U.S. Code § 1836 (b) (1), the trade secrets are "related to a product or service used in, or intended for use in, interstate or foreign commerce," given that the DRA products are made for pipelines that span the nation and the world.

94.     The first trade secret that Aquila owns is the choice of monomer, monomer purity and monomer receipts, including the source of monomer, technical specifications, and contract details Purity of monomer.

95.     The second trade secret concerns the geometry of mole sieves, including type and technical specifications of beads, their method of activation, mole sieve volume per unit area, and residence time for the monomer.

96.     The third trade secret is the ratios, weights, and order of addition of the co-catalyst mixture, including the introduction of the co-catalyst and the selection of the carrier, such as hydrocarbons and oxygenated hydrocarbons) to disperse the co-catalysts.

97.     The fourth trade secret is the introduction of monomer after processing through the mole sieve in the second trade secret, including the rate of introduction, additive selection, and order of addition.

98.     The fifth trade secret concerns the catalyst in the chemical formulation, including the introduction of the catalyst, the selection of the medium to disperse the catalyst, the catalyst

ratios and weights in the dispersion, the mixing geometry, agitation time, speed and duration parameters, and the order of addition to achieve the desired density and polarity.

99.     The sixth trade secret relates to the operating parameters of the dispersion discharge, including the geometric dimensions of the consumable reactor before and after the filling of the reactive ingredients from the reactor.

100.    The seventh trade secret concerns the consumable reactor, including the material of construction, the dimensions of the reactor, and the filled volume dimensions.

101.    The eighth trade secret regards the parameters of the reaction, including operating measurements, the analytical tools used to measure the reaction rate, and placement geometry onto the consumable reactor.

102.    The ninth trade secret applies to polymer aging, including the operating metrics and technical specifications to complete this step.

103.    The tenth trade secret that Aquila owns pertains to the partition agent selection, specifications, weights, ratios and operating metrics and parameters.

104.    The eleventh trade secret applies to the metrics around milling of the product, including the technical process conditions and quality control parameters for milling.

105.    The twelfth trade secret concerns the metrics around dispersion, including the processing conditions for dispersion, constituent temperatures, ratios, and order of addition.

106.    The thirteenth trade secret pertains to quality assurance and quality control, including standard operating procedures, sample extraction and preparation, the analytical tools used to quantify quality assurance and quality control specifications, and the operating conditions

of testing and processes of data analysis to reach the desired quality assurance and quality control specifications.

107.   The fourteenth trade secret regards the standard operating procedures for packaging, loading, and unloading of the final product into shipping and storage packaging and transportation of the product for use by the end-user.

108.   Finally, the fifteenth trade secret concerns the standard operating procedures for storage, handling, mixing, injection, and overall product stewardship for successful use of the product by the end-user.

109.   Pursuant to 18 U.S. Code § 1839 (5) (A), Rice and Oversby misappropriated Aquila's 15 trade secrets by acquiring them and knowing or having reason to know that the trade secrets were acquired by improper means, namely Chou's and Hooker's theft, misrepresentation, and breach of a duty to maintain secrecy pursuant to Chou's and Hooker's execution of the IPA under 18 U.S. Code § 1839 (6) (A).

110.   Under 18 U.S. Code § 1839 (5) (B), Chou similarly misappropriated these 15 trade secrets by disclosing or using them without Aquila's implied or express consent by virtue of his failure to return the laptop, notebooks, and other "repositories of Proprietary information or any other information of a secret, proprietary, confidential or general undisclosed nature relating to [Aquila]," on which Chou recorded data while employed at Aquila pursuant to Section 1.(c) of the IPA.

111.   At the time of Chou's disclosure or use of these trade secrets and pursuant to 18 U.S. Code § 1839 (5) (B) (ii) (II), Chou knew or had reason to know that the knowledge of them

was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets because he had agreed in Section 1. (b) of the IPA not "to communicate, disclose or disseminate any Proprietary Information or any other information of a secret, proprietary, confidential, or generally undisclosed nature relating to" Aquila, "its products, processes and services, including information related to testing, research, development, [and] manufacturing." Ex. B.

112.    Moreover, under 18 U.S. Code § 1839 (5) (B (III), Chou misappropriated these trade secrets by disclosing or using them without Aquila's express or implied consent, given that Chou owed a duty to Aquila, who is seeking relief under DTSA, to maintain the secrecy or limit the use of these trade secrets under the non-disclosure provisions of the IPA that he executed and under state common-law duties of loyalty and confidentiality that he owed to Aquila as his employer. Ex. B.

113.    The misappropriation was willfully and maliciously done to cause Aquila to close down its business. Due to the bad faith and willful nature of the misappropriation, Aquila seeks reasonable attorney's fees.

## DEMAND FOR JURY TRIAL

114.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Aquila respectfully requests a trial by jury of all issues properly triable by jury.

## REQUEST FOR RELIEF

115.    On information and belief, the Defendants have caused or will cause, by their infringing conduct, irreparable harm to Aquila for which there is no adequate remedy at law.

As a result of Defendants' actions and imminent actions, Aquila has suffered and continues to suffer substantial injury, including irreparable harm and damages including loss of sales and profits that Aquila would have made but for the infringement of the '527 Patent, theft of trade secrets and unfair competition.

WHEREFORE, Aquila respectfully requests the following relief:

(a)     A declaration that Flowchem has and will directly infringe, induce others to infringe, and/or contribute to others' infringement when Flowchem manufactures, offers to sell or sells poly alpha-olefin DRA using a process in violation of the '527 Patent;

(b)     A declaration that the data generated by Chou related to the manufacturing of poly alpha-olefin DRA using the process under the '527 Patent is a trade secret;

(c)     A declaration that the refusal by Chou to return the data generated during the manufacturing of poly alpha-olefin DRA using the process under the '527 Patent is violation of the defend trade secret act;

(d)     A declaration that the data generated by Chou related to the development of a DRA for heavy crude while employed by Aquila is a trade secret;

(e)     A declaration that the refusal by Chou to return the data generated by Chou related to the development of DRA for heavy crude while employed by Aquila is a violation of the defendant trade secret act;

(f)     A declaration that the data generated by Chou related to the development of a water slurry for injection of DRA into an oil pipeline while employed by Aquila is a trade secret;

(g)     A declaration that the refusal by Chou to return the data generated by Chou related to the development of water slurry for injection of a DRA into an oil pipeline while employed by Aquila is a violation of the defendant trade secret act;

(h)     A declaration that the data generated by Chou related to the development of a freeze protect formula for injection of DRA into an oil pipeline while employed by Aquila is a trade secret;

(i)     A declaration that the refusal by Chou to return the data generated by Chou related to the development of a freeze protect for injection of a DRA into an oil pipeline while employed by Aquila is a violation of the defendant trade secret act;

(j)     A declaration that the choice of monomer, monomer purity and monomer receipts, including the source of monomer, technical specifications, and contract details is a trade secret.

(k)     A declaration that the geometry of mole sieves, including type and technical specifications of beads, their method of activation, mole sieve volume per unit area, and residence time for the monomer is a trade secret.

(l)     A declaration that the ratios, weights, and order of addition of the co-catalyst mixture, including the introduction of the co-catalyst and the selection of the

carrier, such as hydrocarbons and oxygenated hydrocarbons) to disperse the co-catalysts are trade secrets.

(m)   A declaration that the introduction of monomer after processing through the mole sieve in the second trade secret, including the rate of introduction, additive selection, and order of addition are trade secrets.

(n)   A declaration that the catalyst in the chemical formulation, including the introduction of the catalyst, the selection of the medium to disperse the catalyst, the catalyst ratios and weights in the dispersion, the mixing geometry, agitation time, speed and duration parameters, and the order of addition to achieve the desired density and polarity are trade secrets.

(o)   A declaration that the operating parameters of the dispersion discharge, including the geometric dimensions of the consumable reactor before and after the filling of the dispersed media are trade secrets.

(p)   A declaration that the seventh trade secret concerns the consumable reactor, including the material of construction, the dimensions of the reactor, and the filled volume dimensions are trade secrets.

(q)   A declaration that the parameters of the reaction, including operating measurements, the analytical tools used, and placement geometry onto the consumable reactor are trade secrets.

(r) A declaration that the ninth trade secret applies to polymer aging, including the operating metrics and technical specifications to complete this step are trade secrets.

(s) A declaration that the tenth trade secret that Aquila owns pertains to the co-grinding agent selection, specifications, weights, ratios and operating metrics and parameters are trade secrets.

(t) A declaration that the metrics around milling of the product, including the technical process conditions and quality control parameters for milling are trade secrets.

(u) A declaration that the metrics around dispersion, including the processing conditions for dispersion, constituent temperatures, ratios, and order of addition are trade secrets.

(v) A declaration that quality assurance and quality control, including standard operating procedures, sample extraction and preparation, the analytical tools used to quantify quality assurance and quality control specifications, and the operating conditions of testing and processes of data analysis to reach the desired quality assurance and quality control specifications are trade secrets.

(w) A declaration that the standard operating procedures for packaging, loading, and unloading of the final product into shipping and storage packaging and transportation of the product for use by the end-user are trade secrets.

(x) A declaration that the standard operating procedures for storage, handling, mixing, injection, and overall product stewardship for successful use of the product by the end-user are trade secrets.

(y) A judgment holding that the '527 Patent is valid and enforceable;

(z) Damages for patent infringement for the maximum amount as permitted under 35 U.S.C. § 284 against Flowchem, Chou, Hooker, Oversby and Rice.

(aa) Damages under the Defendant Trade Secrets Act for actual losses, unjust enrichment, or, in the alternative, royalties for the unauthorized use or disclosure of the trade secret against Chou, Hooker, Oversby and Rice.

(bb) Exemplary damages for the willful and malicious misappropriation under the Defend Trade Secrets Act including doubling the total monetary award against Chou, Hooker, Oversby and Rice.

(cc) Reasonable attorney's fees for bad-faith under the Defend Trade Secrets Act against Chou, Hooker, Oversby and Rice.

(dd) A judgment against Flowchem, Chou, Hooker, Oversby and Rice declaring that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding Aquila its reasonable attorneys' fees;

(ee) A permanent injunction preventing Flowchem, and the directors, officers, agents, servants, employees, and those acting in concert or participation with Flowchem, including but not limited to Chou, Oversby, Rice and Hooker, from committing acts

of direct infringement, contributing to infringement, and/or inducing infringement of the '527 Patent;

(ff)    A permanent injunction preventing Chou, Hooker, Oversby and Rice from committing acts in violation of the defend trade secrets act, contributing to acts in violation of the defend trade secrets act, and/or inducing acts in violation of the defend trade secrets act; and

(gg)    Any and all such other relief as this Court deems just and proper.

JULY 16, 2026                                             Respectfully submitted,

THE WATTS LAW FIRM, P.C.

By: _____

Joseph K. Watts
FEDERAL BAR NO. 22812
Texas Bar No. 24005135
Main: (832) 793-9531
Direct: (832) 793-7941
Mobile (832) 226-2491
jwatts@wattslaw.net
11777 Katy Fwy, Suite 570 S
Houston, Texas 77079
*Attorneys for Plaintiff*
*Aquila Pipeline Services, LLC*